

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| KDE:AS | *271 Cadman Plaza East* |
| F. # 2016R00512 | *Brooklyn, New York 11201* |

January 29, 2020

By ECF

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York  11201

        Re:    United States v. Leonid Kotovnikov
                  Criminal Docket No. 16-526 (BMC)

Dear Judge Cogan:

        The government respectfully submits this letter, pursuant to Section 5K1.1 of the United States Sentencing Guidelines (the "Guidelines"), and Title 18, United States Code, Section 3553(e), to apprise the Court of the substantial assistance provided by the defendant Leonid Kotovnikov and permit the Court, in its discretion, to impose a sentence below the otherwise applicable statutory minimum sentence and advisory Guidelines range.  Kotovnikov is scheduled to be sentenced by the Court on February 18, 2020.

I.       Background and Criminal Conduct

    A.    The Investigation

        Leonid Kotovnikov, along with co-defendant Semen Parnis, were local cocaine dealers.  Presentence Investigation Report ("PSR") ¶ 7.   They were arrested following controlled purchases by a confidential source and subsequent wiretaps on Kotovnikov's and Parnis's cell phones.  PSR ¶¶ 7-11.

        The evidence collected by the investigators during the interception period against Parnis and Kotovnikov was overwhelming.  For example, in February 2016, a confidential source ("CS-1") contacted Parnis at the direction of Drug Enforcement Administration ("DEA") agents and asked to buy cocaine.  Parnis then instructed CS-1 to call a co-conspirator ("CC-1").  Later that day, CS-1 met with CC-1 at a parking lot in Brooklyn, New York.  Agents conducting surveillance of the parking lot saw CC-1 approach CS-1 in a dark blue Lexus RX350 sports

utility vehicle (the "Lexus"). CC-1 then entered CS-1's car and sold him cocaine in exchange for $500, which cocaine the DEA subsequently seized.

In March 2016, CS-1 again contacted Parnis to purchase cocaine. Parnis told CS-1 to meet him near the parking lot where CS-1 previously bought cocaine from CC-1. Agents conducting surveillance saw Parnis and Kotovnikov arrive in a black Cadillac Escalade. After Parnis and Kotovnikov exited the Escalade and approached CS-1, Kotovnikov gave CS-1 approximately 28 grams of cocaine in exchange for $1,000, which cocaine the DEA subsequently seized. Between late March and July 2016, DEA agents coordinated additional controlled purchases of thousands of dollars' worth of cocaine from Parnis and Kotovnikov, involving multiple confidential sources. PSR ¶¶ 7-11.

A subsequent wiretap on Parnis's and Kotovnikov's cell phones established that CC-1 worked as a courier for the defendants and distributed cocaine at their direction. Parnis frequently called CC-1 to inquire about CC-1's sales. During a text message exchange on March 28, 2016, for example, Parnis asked CC-1, "How's today looking." CC-1 responded "3," which was a reference to a quantity of cocaine. Parnis then wrote, "What about fri and sat," and CC-1 responded by texting, "Fri and sat 50," indicating that he sold 50 grams of cocaine on those days. Later that day, Parnis called CC-1 and asked, "So what do you have left, 20?" As another example, on April 9, 2016, Parnis criticized CC-1 for not picking up his phone when customers called: "What's up [CC-1]? Somebody said they called the phone. You didn't pick up. . . . Rob said he called the phone. You didn't pick up, and yesterday two people text and you didn't pick up."

CC-1 also took direction from Kotovnikov. On May 11, 2016, for example, a customer tried to buy cocaine from CC-1 on credit, and when CC-1 refused to provide him with cocaine, the customer called Kotovnikov and asked for permission: "[My wife] took my wallet. . . . Can [CC-1] give me one? I promise tomorrow, I'll either see you or him." The customer then put CC-1 on the telephone and Kotovnikov told CC-1, "Give it to him. He will pay you back tomorrow."

Other intercepted communications involved discussions with cocaine suppliers. For example, in late March 2016, Parnis called a supplier and told him "I need ASAP . . . two 28s, separate." Parnis then said about the transaction, "I'm giving him a G. . . . It has to be solid and good. Solid." In another call with a supplier, the supplier told Parnis that he had "rock," i.e., crack cocaine, and Parnis replied that he would meet up with the supplier to "bag it up."

At least one call showed how the co-conspirators had been able to avoid detection. During an intercepted telephone call on May 4, 2016, Parnis told Kotovnikov that he threw cocaine out of his car window while driving because he believed (correctly) that law enforcement was following him: "I had these nig**s after me." Kotovnikov asked, "Did you put in the garage?" Parnis clarified that law enforcement was after him: "I had, I had a lot, ten on me. They were behind me. And I turned the corner, just fucking tossed them out of the window [unintelligible]. Just tossed them." Kotovnikov responded, "Aha Ok."

B.  Indictment and Arrest

Parnis and Kotovnikov were indicted on October 2016 for distributing and conspiring to distribute at least 500 grams of cocaine.  See Dkt. No. 1.  They were arrested as part of the comprehensive takedown the following month, along with trial defendants Leonid Gershman and Aleksey Tsvetkov.  On May 26, 2017, Kotovnikov pleaded guilty to both counts, pursuant to a cooperation agreement.  As part of his cooperation, described below, Kotovnikov voluntarily disclosed other crimes he had committed and admitted to trafficking over five kilograms of cocaine.

C.  History of Trafficking Cocaine

As Kotovnikov admitted at trial, he learned the cocaine business from Renat Yusufov, for whom he served as a drug runner, selling cocaine for about three years.  Transcript of the Gershman and Tsvetkov Trial ("Tr.") 1178:23-1179:3.  The two men even lived together for over a year.  Tr. 1179:6-8.  Soon after Kotovnikov started delivering cocaine for Yusufov, Parnis joined the business.  Tr. 1183:15-19.  At some point, Kotovnikov and Yusufov got into an argument and Yusufov fired Kotovnikov.  Tr. 1160:23-1161:5.  After a "short period of time," Kotovnikov started his own cocaine-delivery business, and Parnis joined him soon thereafter.  Tr. 1161:8-11; Tr. 1186:8-18.  About two years later, Yusufov threatened Kotovnikov because Yusufov believed Kotovnikov and Parnis were selling cocaine to his clients.  Tr. 1161:21-1163:10.  Kotovnikov and Parnis sold cocaine together for about seven years, earning approximately $2,000 per week.  Tr. 1161:17-20.

II.  Guidelines Calculation

The government respectfully submits that the following Guidelines calculation should apply at sentencing, resulting in a Guidelines range of 108 to 135 months, based on a Criminal History Category I:

| | |
|---|---|
| Base Offense Level (§ 2D1.1(c)(5)) | 30 |
| Plus:  Role Adjustment (§ 3B1.1(a)) | +4 |
| Less:  Timely Acceptance of Responsibility (§ 3E1.1(a) & (b)) | -3 |
| Total: | 31[1] |

This calculation differs from the one in the PSR in two respects.  *First*, the government submits that a four-point role enhancement is required because, as explained above, Kotovnikov (along with Parnis) ran a cocaine conspiracy, which included tasks like hiring and managing drug runners, obtaining wholesale quantity of cocaine, and dealing with a competitor, Yusufov, when they purportedly encroached on his territory.  By Kotovnikov's own admission, the conspiracy involved at least five members — Kotovnikov, Parnis, Bobritsky (briefly), CC-1,

---

[1] Absent this motion, Kotovnikov's conviction also carries a mandatory minimum sentence of 60 months.

and another drug runner identified by Kotovnikov during a proffer. Notably, the government was not aware of the fifth member of the conspiracy until Kotovnikov's proffered about it.

*Second,* the PSR reduces Kotovnikov's offense level by two points under U.S.S.G. § 2D1.1(b)(17) (subsection (b)(18) of the 2018 Guidelines Manual), which refers to U.S.S.G. § 5C1.2, and is aimed at low-level drug offenders who have no criminal history, have disclosed their crime to the government, and have not injured another individual or used threats. Kotovnikov qualifies under all the criteria in § 5C1.2 except (a)(4), which provides that a defendant cannot be an "organizer, leader, manager or supervisor of others in the offense" and receive the two-level reduction. As set forth above, Kotovnikov, among other things, managed drug runners, and he therefore does not qualify.

III.  Cooperation with the Government

As detailed below, Kotovnikov's cooperation was important for three reasons. *First*, he was a victim of two extortions by Gershman, and the government would likely have been unable to secure convictions on both of those offenses without Kotovnikov's testimony. *Second*, the money Gershman collected from one of the extortions trickled down to Yusufov and Bobritsky, even though Yusufov had not participated in the crime. That provided a concrete example of how the Syndicate members divided profits from crimes committed by their associates — evidence on which the government will draw if Gershman and Tsvetkov attack enterprise proof on appeal. See Tr. 1321 (the Court noting some concern, prior to summations, about the racketeering theory because, according to the Court, there was no obvious "sharing, pooling of profits" between associates). *Third*, Kotovnikov chose to cooperate early in the case, and his cooperation likely led to the cooperation of the government's primary witness at trial, Yusufov, who began proffering with the government after the June 2017 superseding charged him with cocaine-trafficking and firearm-possession, charges that were based in part on information provided by Kotovnikov.

A. Kotovnikov's Pre-Trial Cooperation

Kotovnikov began proffering with the government in May 2017. The government found Kotovnikov forthcoming and credible in the proffers. In particular, in his proffers, Kotovnikov admitted to a larger and longer drug conspiracy than the one for which he was charged. He acknowledged distributing significant quantities of cocaine, partnering with different co-conspirators, and making approximately $2,000 per week. He also admitted to committing other crimes, including Medicaid fraud (by receiving Medicaid since he was 18 despite a significant income from drug-dealing), insurance fraud (by registering his vehicles to an address outside of the city, where he did not live, to obtain lower rates), failing to file taxes (to declare his drug profits), and opening a corporation through which he planned to launder drug money, though he never followed through. Tr. 1164:7-22.

As a result of this information, Kotovnikov was required to acknowledge in his plea agreement that (1) he had been part of a separate cocaine distribution conspiracy between 2006 and 2009, (2) his charged conspiracy stretched beyond the single year for which he was indicted — he admitted that he had sold cocaine with Parnis for approximately seven years —

4

and (3) he was responsible for distributing over five kilograms (rather than just 500 grams, as charged) of cocaine.

In addition to his own involvement, Kotovnikov provided information about co-conspirators, including couriers, his partner (Parnis), and more culpable individuals, like Renat Yusufov, with whom he had lived for a time and observed in possession of a firearm. Kotovnikov also proffered about lead defendant Leonid Gershman's marijuana conspiracy, Gershman's associate in that conspiracy (Vyacheslav Malkeyev), and their courier (Eric Bobritsky).

As he ultimately testified at trial, Kotovnikov was also a victim of Gershman's extortion. His testimony led to (some of) Gershman's convictions for extortion: racketeering acts eight and nine, as well as Count Fourteen, charging Gershman with Hobbs Act and New York state extortions for two separate incidents. Kotovnikov's testimony at trial about these extortions was consistent with his proffers. It is detailed below.

B. Kotovnikov's Testimony

At trial, Kotovnikov testified that in approximately 2013-2014, he was away in the Poconos with his wife and others, including defendants Malkeyev (also known as "Steve Bart") and Eric Bobritsky. Tr. at 1168:10-17. There, Bobritsky expressed his dissatisfaction with how he was being treated by Gershman and Malkeyev — Bobritsky's two bosses in the marijuana business. Tr. at 1168:17-21. Kotovnikov relayed Bobritsky's feelings to Malkeyev. Tr. at 1168:22. Soon after returning from the Poconos, Gershman called Kotovnikov demanding that Kotovnikov come to his house. Tr. at 1168:23-25; 1169:18-20. The following day, Kotovnikov testified, he went to the Gershman's house, and Gershman "started screaming at me[,] telling me that I messed up his family, meaning, relations with Eric [Bobritsky] and Steve [Malkeyev] and because of that I got to give him $10,000." Tr. at 1168:3-7. As Kotovnikov further recalled, Gershman told him "in an angry tone that, basically, if I don't want problems that I got to give him money because I fucked up his family as far as between Eric and Steve." Tr. at 1170:6-8.

Kotovnikov paid the $10,000 because the Gershman threatened him and his family, telling him he knew "where my wife sleeps," and because Gershman had a reputation in the neighborhood as a "gangster," who was "always into fights[,] always getting into trouble with somebody else." Tr. at 1170:17-1171:3.[2]

About a year later, in 2015, Gershman extorted Kotovnikov again. Kotovnikov testified that Bobritsky came to Kotovnikov, told him that he left Gershman's marijuana business

---

[2] Kotovnikov's description of Gershman's reputation was echoed by other witnesses, who referred to Gershman as: a "serious guy" who was ready to inflict physical punishment or had others do it for him, Tr. at 600:6-22 (Denis Dulevsky testifying as to why he paid the Gershman money); a person with a "reputation. You don't cross a person like that," Tr. 515:13 (Zarbailov explaining why he believed Gershman was ready to permanently scar his face); and a "guy who takes care of problems" and someone who uses "intimidation, violence," Tr. 68:25-69:3 (Yusufov explaining why he went to Gershman to solve "problems").

5

because of an argument, and asked if he could join Kotovnikov's cocaine business. Tr. 1172:14-1173:21. Bobritsky's partnership with Kotovnikov was short-lived because the Gershman called Bobritsky and the two reconciled. Tr. 1174:12-18. Gershman called Kotovnikov too, once again demanding to see him. Tr. 1174:19-1175:1. Kotovnikov remembered meeting Gershman and Bobritsky on the corner of Kotovnikov's block. Tr. 1175:2-3. Gershman was upset that Kotovnikov had hired Bobritsky and told him that "because you let him work for you for a month in the neighborhood and you made me look like a clown . . . you owe me $2,500." Tr. 1175:3-6. Kotovnikov, still fearing Gershman, paid the money. Tr. 1175:9-14.[3]

In addition to the extortions, Kotovnikov also testified about (1) Malkeyev's taking bullets back to Gershman, Tr. 1167:21-1168:9, (2) his recollection of how Gershman boasted about protecting Kotovnikov from Aleksey Tsvetkov, Tr. 1176:18-1177:22, and (3) Tsvetkov's post-arrest statement to Kotovnikov, about who "set [the defendants] up [in getting them all arrested]," Tr. 1177:23-1178:14.

After he was convicted of all 26 counts — including the charges related to Kotovnikov — Gershman moved for a new trial on one of the two racketeering acts (and related substantive count) involving Kotovnikov. See Dkt. Entry No. 358. Gershman claimed that Kotovnikov committed perjury (about failing to disclose to the government his work with a "bookie" involving in sports betting), and the government failed to correct it.[4] The Court denied that motion, noting that Kotovnikov truthfully answered the questions posed to him by

---

[3] Kotovnikov's testimony was corroborated in part by Yusufov and Bobritsky. See November 25, 2018 Memorandum and Order Denying Gershman's Motion for New Trial, Dkt. Entry No. 367, at 7 (noting that while there was not perfect consistency, "Bobritsky's testimony tends to support Kotovnikov's version of events). Bobritsky recalled the Poconos trip that Kotovnikov had described, remembering it was "upstate or Pennsylvania." Tr. 954:11-15. Like Kotovnikov, he remembered a dispute stemming from Bobritsky's complaints to Kotovnikov about Bobritsky's role in the marijuana business. Tr. 954:16-955:12. After the trip, Bobritsky recalled that Gershman directed him to go to Gershman's house, where Gershman said Kotovnikov would report as well. Tr. 955:16-956:1. Gershman instructed Bobritsky to "punch [Kotovnikov] in his face" if Kotovnikov denied talking about Bobritsky's purported unhappiness in the marijuana business. Tr. 956:9-13; see also Tr. 955:23-956:1 And exactly as Kotovnikov recalled with regard to the first extortion, Bobritsky testified that Gershman demanded $10,000 from Kotovnikov as punishment for causing friction between Gershman, Malkeyev, and Bobritsky. Tr. 956:18-957:10. Gershman paid Bobritsky $1,000 "because it was a job that was done that was because of me or involved me." Tr. 957:11-15. On cross-examination, Bobritsky also corroborated having worked for Kotovnikov for a "brief period," selling cocaine. Tr. 990:10-11. Yusufov testified that he received a cut from Gershman's extortion of Kotovnikov as well. He recalled that Gershman recounted to him how Kotovnikov had been "talking shit about [Gershman]," and so Gershman "set up a meeting with him." Tr. 150:2-6. Yusufov further testified that Gershman demanded $10,000 from Kotovnikov for the "problem to go away." Tr. 150:13-14. And when Gershman collected the money, he gave Yusufov $500, telling him it was "from a Leo job"; Yusufov had gotten paid by Gershman without having to do anything to earn the money because "we were group of friends" and we "make sure that everybody ate . . . that everybody looked after one another." Tr. 150:23-151:20.

[4] Kotovnikov admitted at trial that he worked for a bookie collecting bets on football games and placing his own bets. Tr. 1193:17-1195:17.

6

Gershman's counsel about his role as a supposed bookie. See Nov. 25, 2018 Memorandum and Order Denying Gershman's Motion for New Trial, Dkt. Entry No. 367, at 4-6. Gershman's counsel, "may have intended to ask Kotovnikov" something different but any disconnect between the intended question and the actual answer, the Court concluded, was caused by Gershman's counsel, not by any perjury committed by Kotovnikov. Id. at 5-6; see also id. at 9 (noting that Gershman had all the available impeachment information at his disposal for cross-examination but declined to use it).

IV.    Conclusion

For the foregoing reasons, the government respectfully submits this motion to permit the Court, in its discretion, to impose a sentence below the statutory minimum sentence and the applicable Sentencing Guidelines range.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:    /s/
Andrey Spektor
Sarah M. Evans
Assistant U.S. Attorneys
(718) 254-7000

cc:    Edward V. Sapone, Esq. (by ECF)
Chase Ruddy, Esq (by ECF)
U.S. Probation Officer Roberta Houlton (by ECF)